CONTINENTAL ILLINOIS NATIONAL
BANK AND TRUST COMPANY OF
CHICAGO, Plaintiff,

v.

R. L. BURNS CORP., Central National
Bank of Chicago, and William A.
Brandt, Defendants.

No. 78 C 3674.

United States District Court,
N. D. Illinois, E. D.

Feb. 29, 1980.

Anne C. O'Laughlin, Chicago, Ill., for plaintiff.

Robert Watson, George A. Platz, Sidley & Austin, George W. Hamman, Liebling, Uriell & Hamman, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This is an action to compel defendants to interplead their claims in compliance with the Federal Interpleader Act, 28 U.S.C.

§§ 1335, 1397, and 2361.[1] Continental Illinois National Bank and Trust Company of Chicago ("Continental") presently holds in escrow the amount of $200,000 deposited by defendant R. L. Burns Corporation ("Burns") pursuant to a Settlement Agreement between defendants William A. Brandt ("Brandt") and Central National Bank of Chicago ("CNB"). Each of the defendants have asserted claims allegedly entitling them to all or some portion of the funds in the escrow account. Continental is unable to resolve these conflicting assertions of ownership and, in order to avoid multiple and vexatious litigation and multiple liability, has filed this action to force the defendants to settle their respective rights to the $200,000.

On January 15, 1976, Pyro Mining Company ("Pyro"), LaFayette Coal ("LaFayette"), and Brandt defaulted on a Supplemental Loan Agreement with CNB dated March 12, 1974, as well as on other related security agreements.[2] On March 12, 1974, these parties also entered into an Amended and Restated Loan and Security Agreement. Under this new refinancing plan, CNB agreed to waive all previous defaults and to provide additional financing to Pyro and LaFayette, in loans up to three and one million dollars, respectively. In consideration for the waiver and additional loans, Pyro executed and delivered a time note to CNB obligating Pyro to make a payment of approximately $3 million on March 31, 1976. LaFayette issued a demand note of $1 million. In addition, Brandt and his wife personally guaranteed the corporate indebtedness and also released CNB from any potential liability under the agreements.

Pyro defaulted on its obligation to repay part of the principal and interest due on March 15, 1976. CNB then notified the parties that they had until March 25th to cure all existing defaults. The penalty for failure to meet the deadline would be an acceleration of all liabilities. Unable to cure the default on time, Brandt resigned from Pyro and LaFayette on March 26, 1976. Later that same day, both corporations filed voluntary petitions for bankruptcy which were contested by CNB.

In an effort to resolve this situation, Brandt, CNB, Pyro, LaFayette, and others entered into a Settlement Agreement ("Settlement Agreement") on April 16, 1976.[3] Pursuant to the Settlement Agreement, Brandt agreed to transfer all of his right, title, and interest in 28,961 shares of Pyro common stock to CNB. CNB thereby became the sole legal and beneficial owner of this stock. In addition, CNB agreed that if and when the stock was resold, 80% of the proceeds over and above the bank indebtedness would be remitted to Brandt.[4] CNB also gave Brandt an exclusive option to repurchase the Pyro stock before June 21, 1976, if certain conditions were met.[5] CNB released Brandt and his wife from liability arising from their personal guarantees of the loans in default.

Despite serious efforts to sell Pyro before the June 21 deadline, Brandt was unable to find a willing buyer. On June 23rd, CNB and Burns executed a stock purchase agreement for the Pyro common stock. In con-

1. Section 1335 jurisdictional requirements have been satisfied. At least two of the claimants are of diverse citizenship—defendants Brandt and Central National Bank are citizens of Illinois and defendant Burns, for purposes of diversity, is a citizen of both Delaware and California. The second requirement for an interpleader action, that the amount in controversy exceed $500, has also been met.

2. Pyro and LaFayette are corporations owned by Brandt. LaFayette acted as the sales agent for Pyro. Brandt and his wife had personally guaranteed the repayment of the loans made to these two corporations.

3. This Settlement Agreement was approved by Bankruptcy Judge Thomas W. James of the United States District Court for the Northern District of Illinois by order dated April 19, 1976.

4. In addition to the bank indebtedness, CNB was entitled to $90,000 for the Pyro preferred stock before any payment under the 80% clause would be made.

5. To exercise the option, Brandt had to meet the following conditions: (1) full satisfaction of all bank indebtedness; (2) purchase of Pyro preferred stock held by CNB for $90,000; and (3) payment to CNB of $10 in cash.

sideration for the stock, Burns (1) paid CNB $90,000 for Pyro preferred stock, (2) guaranteed payment of Pyro's indebtedness, and (3) paid $200,000 into an escrow account to secure the representations and warranties of the selling shareholder. The escrow deposit eventually would be applied to the purchase price of the common stock.

Pursuant to the interpleader action, Brandt has filed a cross-claim against CNB. Brandt contends that the Settlement Agreement imposed a duty on CNB to act in a commercially reasonable manner in selling the stock. Brandt further contends that CNB breached this duty (1) by selling stock purportedly worth $15 million for approximately $6 million, resulting in a loss of approximately $9 million, (2) by refusing to accept offers from other prospective purchasers, and (3) by not attempting to find other potential buyers. In addition, Brandt claims CNB breached its fiduciary duty by acting in an oppressive manner with willful and wanton disregard for the rights of Brandt. Brandt seeks $9 million in compensatory damages plus an award of punitive damages, interest, and the costs of this action. Presently pending before the Court is CNB's motion for summary judgment on Count I of Brandt's cross-claim.[6]

## DUTY TO ACT IN A COMMERCIALLY REASONABLE MANNER

Based on the 80% provision in the Settlement Agreement, Brandt contends that § 9–504 of the Uniform Commercial Code (UCC) controls these transactions and imposes a duty on CNB to act in a commercially reasonable manner. § 9–504 of Chapter 26 of the Illinois Revised Statutes provides in relevant part:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .

\* \* \* \* \* \*

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. (Emphasis supplied).

CNB, on the other hand, argues that the relevant statutory provision is § 9–505 of the UCC:

(2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. . . . If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under Section 9–504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

*Ill.Rev.Stat.* Ch. 26, § 9–505.

If § 9–504 is found to be applicable, Count I of Brandt's cross-claim would not be ripe for summary judgment. Since the question of whether CNB acted in a commercially reasonable manner is a material

---

**6.** Count II is an alternative theory alleging Brandt's equitable interest in 80% of the escrow fund under the terms of the Settlement Agreement. This count is not the subject of CNB's present motion for summary judgment.

fact disputed by the parties, Fed.R.Civ.P. 56 would preclude summary judgment relief. However, under § 9–505, the relevant facts have been established and are undisputed, thus summary judgment would be a suitable means for resolution of the cross-claim.

§ 9–505 is clearly an exception to § 9–504 which states the general rules regarding the disposition rights of the secured party after default, the applications of the proceeds of the disposition, and the effect of the disposition. Only in those situations where no objections have been made within twenty-one days to a secured party's proposal to retain the collateral in satisfaction of the obligation or where the debtor has signed a statement renouncing his rights will the provisions of § 9–505 come into play. § 9–505(2) provides "a procedure by which the parties may agree, after default, that the secured party retain the collateral in satisfaction of the obligation secured by it." Illinois Code Comment, *Ill.Rev.Stat.* Ch. 26, § 9–505, at 351.

■ Brandt contends that the Settlement Agreement indicates that § 9–504 is applicable. Paragraph 1.6 of this agreement provides that Brandt will be entitled to 80% of the proceeds if CNB elects to sell the Pyro stock. This provision allegedly imposes a duty on CNB to sell the stock in a commercially reasonable manner. The Court rejects this argument. In return for CNB's agreement to release and discharge him from his personal guarantees on the loans to Pyro and LaFayette, Brandt transferred and conveyed to CNB

all of his right, title and interest in the 28,961 shares of the common stock of Pyro (the "Pyro Common Stock") that are presently pledged to Bank as security for certain of William A. Brandt's liabilities and obligations to the Bank. *The Bank shall be the sole legal and beneficial owner of the Pyro Common Stock.* (Emphasis supplied).

Settlement Agreement, ¶ 1.1. In the judgment of the Court, this agreement satisfies the requirement of § 9–505(2) that a debtor may sign "after default a statement renouncing or modifying his rights." Paragraph 1.1 is explicit evidence of Brandt's waiver of his right to the common stock held as collateral by CNB in return for the discharge of his personal liability on the corporate indebtedness.[7] CNB became the sole owner of the stock and was under no duty to sell the stock in accordance with the provisions of § 9–504.

Moreover, the Settlement Agreement acted as notice to Brandt of CNB's intention to retain the collateral in satisfaction of Brandt's obligation. The proposed Settlement Agreement represented the written notice required under § 9–505(2). Brandt's voluntary signature was sufficient to constitute a renunciation of his rights. Also, since no objection was received within twenty-one days, CNB was entitled under § 9–505 to "keep the goods [Pyro stock] in lieu of sale on failure of anyone receiving notification to object within twenty-one days." Uniform Commercial Code Comment, *Ill.Rev.Stat.* Ch. 26, § 9–505, at 354.

## BREACH OF FIDUCIARY DUTY

[2] Brandt maintains that the Settlement Agreement created an agency coupled with an interest, thus giving rise to a fiduciary duty on the part of CNB. Paragraph 1.6 of the Agreement provides:

If and when Bank sell the Pyro Common Stock, Bank shall remit to William A. Brandt 80% of the monies actually received by Bank with respect to the total purchase price of the Pyro Common Stock, *provided,* however, that no such payment shall be made until Bank has received:

a. Full payment of all of the indebtedness and liabilities to Bank of Pyro, LaFayette, Black Tam or the Debtors-in-Possession; and

7. The language of § 9–505(2) "clearly permits a debtor to reduce or waive the waiting period" of twenty-one days for an objection to the notice of the secured party's proposal by signing a statement after default renouncing his rights in the collateral. Illinois Code Comment, Ill. Rev.Stat. Ch. 26, § 9–505(2), at 352.

b. Payment of $90,000 as the purchase price of the Pyro Preferred Stock.

Based upon this provision, Brandt claims that CNB was its agent entrusted with the duty of selling Brandt's shares of Pyro stock. However, there is no evidence that an agency relationship was created by the Settlement Agreement. Brandt could not bestow on CNB the power to sell the stock since under the terms of the agreement, CNB became the sole legal and beneficial owner of the stock transferred by Brandt. Furthermore, CNB never expressly agreed or implicitly consented to act as Brandt's agent in the subsequent disposition of the stock.[8]

Brandt relinquished all rights to the Pyro stock in return for a release from all liability. The language of the agreement explicitly provides that CNB was the sole beneficial and legal owner of the stock. In effect, Brandt retained only a contractual right to certain proceeds from the sale of stock "when and if" CNB decided to sell or was required to do so. CNB was under no obligation to sell the stock on behalf of or in the interest of Brandt. The Settlement Agreement clearly contemplates that CNB was to be given complete dominion and control over the stock. No fiduciary duty was breached by the sale of the Pyro common stock to Burns for the amount of the bank indebtedness.

## CONCLUSION

The Settlement Agreement of April 16, 1976, is sufficient to invoke the provisions of § 9–505 of the Uniform Commercial Code. Under § 9–505, CNB was under no duty to Brandt to sell the Pyro common stock in a commercially reasonable manner. CNB obtained complete control over the subsequent dispositions of the stock and never acted as Brandt's agent. Brandt merely retained a contractual right entitling him to 80% of the proceeds over and above the amount of bank indebtedness

should the stock ever be sold. Accordingly, summary judgment is granted to CNB with respect to Count I of Brandt's cross-claim. It is so ordered.

---

**8.** Both parties agree that under applicable national banking laws, CNB could not retain the stock indefinitely but would be required to sell it within a reasonable period of time. 12 U.S.C.

§ 24. However, the mere fact that CNB eventually would be required to dispose of the stock has no effect on whether an agency relationship was created.